UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PINE TOP RECEIVABLES OF ILLINOIS, LLC, a limited liability corporation ) ) ) | |
| Plaintiff, ) | No. 12-CV-6357 |
| v. ) ) | Judge Marvin E. Aspen |
| BANCO DE SEGUROS DEL ESTADO, ) A Statutory corporation wholly owned by the ) Sovereign Republic of Uruguay, ) ) | |
| Defendant. ) | |

## PTRIL'S BRIEF IN OPPOSITION TO
## MOTION FOR SUMMARY JUDGMENT

Banco has filed a motion seeking summary judgment that the claims being presented by Plaintiff are barred by applicable statutes of limitation. In support of that motion, it has filed a Rule 56.1 statement containing 67 statements of "material fact," supported by no less than 519 pages of evidentiary material. The most impressive feature of the statement and its supporting material is that nearly all of each documents addresses claimed "facts" that have no bearing on the statute of limitations.

The facts that do bear on the statute of limitations are fairly simple and essentially undisputed. Clearing away the clutter created by Banco's tendency to embroider on the argumentatively, they are set out in Plaintiff's accompanying Rule 56.1 statement.

The heart of Defendant's plea is enticing: Plaintiff and Defendant entered into written contracts of reinsurance which expired between 1978 and 1984. Although it has been billed

repeatedly, Defendant has not paid a dime since 1985. Surely the statute of limitations has run by now? However enticing the proposition, the answer is, "no."

> I. **Liquidating Large Property and Casualty Insurers Takes An Extraordinary Amount of Time.**

Plaintiff's assignor, Pine Top Insurance Company, became insolvent and was placed into liquidation in 1987. The Liquidator did not issue the accounting on which Plaintiff's claims depend until 2008. The underlying claims relate back to insurance policies issued in 1986 and before. So it is indisputably true that the receivables which PTRIL seeks to collect are elderly. But this does not mean that they are barred from collection.

A feature of insurance and reinsurance written on an "occurrence" basis, (as nearly all such insurance was between 1973 and 1984, when Pine Top conducted business) is that claims may continue to be presented long after the policy "expires." Even now, environmental, product liability and medical malpractice exposures, among others, surface long after the policies that cover them have expired. A workers compensation claim may resurrect itself long after the worker ceases working. So the fact that the policy "expired" does not meant that its exposure has, too.

Pine Top Insurance Company specialized in assuming such "long-tail" risks, on the theory that, while waiting for the risks to emerge, it would have the benefit of investment income on the accumulated premiums. Some famously profitable insurers have prospered by following this theory. But for many insurers likr Pine Top, the investment income earned was insufficient to cover the massive liabilities that developed on its policies. Pine Top sought to diversify its risks by assuming small percentages of other insurer's obligations, and then purchasing reinsurance from hundreds of reinsurers.

The strategy backfired. Premiums were too low, too many of its reinsurers collapsed or refused to perform, and an expansion of the concepts of product liability and environmental responsibility drastically increased the costs of underwriting errors. The Liquidator of Pine Top has reported that Pine Top insured, to one degree or another, nearly all of the SuperFund environmental sites, much of the asbestos industry, numerous major hurricanes and other weather losses, breast implants, contraceptive inserts, lead poisoning, toxic shock syndrome, bad baby formula, – and numerous other sad stories. And while its reinsurers were willing to accept shares of Pine Top's premium, some were either unwilling or unable to promptly pay their shares of its losses. The result was that Pine Top was unable to pay its own bills.

Many reinsurers, in the United States and elsewhere, trod the same path in the middle '80's, creating huge challenges for liquidators. Previously, liquidators generally dealt with the affairs of small auto insurers, not multinationals who dabbled in far-away risks and bought and sold layer upon layer of reinsurance from entities in all around the world. The statutory scheme provided by the fifty states' individual insurance liquidation laws, designed for those small and simple businesses, did not adapt easily to the problems presented by these companies.

Two statutory provisions shaped the handling of most of the insurer liquidations of this vintage in the United States. First, most states required[1] that liquidators pay the claims of policyholders, and persons claiming through them, before paying claims of "general" creditors, a category that included reinsurers. 215 ILCS 5/209 is the Illinois version. That is easy to implement when the policyholder is the driver of a family car. It is a little more daunting when the policyholder is Dow Corning or Johns Manville, confronted with product liability exposures for which claims continue to emerge years after the victim has been exposed, and that are

---

[1] Today every state does.

impossible to resolve quickly.  But under the statute, such claims must be resolved before the liquidator can even consider settling matters with the company's reinsurers and reinsureds.

Second, all states include, in their receivership laws, a requirement that the liquidator pay each claimant only once, so that "mutual debts and mutual credits" should be offset against each other, "and the balance only allowed and paid." 215 ILCS 5/205.  This had two effects in liquidation.  First, insurers and reinsurers in the '70's had locked themselves into a dense web of mutual transactions, so that a company might provide reinsurance to numerous insurers who might, in turn, reinsure the it for other business.  A liquidator seeking to ascertain how much he owed a reinsurer or whether a reinsurer owed him, needed to sort through the entire web to find the answer.  That took a great deal of doing.

Second, but not least, treaty reinsurance, of the type in issue here, involves extremely complex and long-running accounting.  Exhibit PT-D is an example, plucked at random, of a single account provided by Pine Top to defendant here.  It fills two pages of tiny type – and it's only a single quarterly report.  The various balances derived from it would have been carried over from one quarter to the next.[2]   To determine the amount of a single reinsurer's claim or obligation, the Liquidator would need to determine the claims of all insureds or reinsureds that might be covered, not only by this, but every other reinsurance "involvement" between Pine Top and the several dozen reinsurers who, along with Banco, signed on to First Surplus Quota Share treaty, as well as each of the other contracts under which Pine Top either reinsured or was reinsured by each of them.

Simply put, it was no easy way to ascertain the "mutual debts and mutual credits" outstanding among Pine Top's hundreds of reinsurers and thousands of insureds and reinsureds.

---

[2] It is interesting to note that the account reported on Exhibit PT-D was already 13 years old.  Yet losses, and even premiums, continued to flow through the reported accounts.

It took the Office of the Special Deputy Receiver 23 years to reach even a rough resolution to the mess, and to do so it had to get court permission to reject all claims development that occurred after 1999. Otherwise it would have been endlessly pursuing a moving target.

Even so, the process of carefully reviewing thousands of inwards claims, and then ensuring that all activity was reported to reinsurers both accurately and in accordance with their individual reinsurance rights, took until July of 2008, when Pine Top's final reinsurance billings were issued and the winners and losers determined.

Pine Top actually beat out some of its cohort. Other insolvent insurers involved in similar business have required even longer. For instance, Mission Insurance Company, like Pine Top liquidated in 1987, is still in proceedings. www.caclo.org/perl/index.pl?document_id=9740bb01260ef0d4158fbd862c62a496. Integrity Insurance Company's receivership was concluded last January, nearly 29 years after it opened. www.iicil.or Transit Casualty Company, whose receivership opened in 1985, closed up shop after 27 years in December of 2012. www.**transitcasualty**.com The Home Insurance Company, placed in liquidation in 2003, is still there. Its Liquidator filed his Fifty Ninth report to the supervising court last Christmas Eve, and has not announced a closing date. www.hicilclerk.org Each of these insurers traded in markets similar to those where Pine Top was active, and each of their liquidators has wrestled with the resulting intractable tangle of claims and recoveries.[3]

Plaintiff recites this history, not to attract the Court's sympathy, but to dispel the natural assumption that, if the Liquidator was still submitting bills to Banco thirty years after the reinsurance contracts were signed, he must have been napping on the job. He (and sometimes she) most certainly was not.

---

[3] One reason the Pine Top estate closed a few years earlier was that it monetized its remnant reinsurance assets by selling to PTRIL.

> **II.    The Statute Of Limitations Does Not Bar Plaintiff's Suit, Because Each Of The Accounting Statements Rendered To Banco, Including That Rendered In 2008, Constituted An "Account Stated" Which, Unless Objected To By Banco With Reasonable Promptness, Reset The Limitations Clock.**
>
>  **a. An "Account Stated" Is Created When One Party To A Business Relationship Involving Multiple Debts And Credits Strikes A Balance, Presents It To The Other, And The Other Acquiesces To It.**

At several points during the liquidation, but most importantly in July of 2008, the Liquidator issued bills to Pine Top's reinsurers. The 2008 bill was important because it was the last of its kind. The Liquidator explained that every possible claim against Pine Top had now been adjusted, and every remaining reinsurance claim that could result from those claims against Pine Top was being presented. (PT-A) The 2008 billings, therefore, were a first step toward the creation of an "account stated."

> "Generally, an account stated is an agreement between parties who have previously conducted monetary transactions that the account representing the transactions between them is true, and that the balance is accurate, together with a promise to pay such balance. (*W.E. Erickson Construction Co. v. Congress-Kenilworth Corp*. (1985), 132 Ill.App.3d 260, 87 Ill.Dec. 536, 477 N.E.2d 513; *LaGrange Metal Products v. Pettibone Mulliken Corp*. (1982), 106 Ill.App.3d 1046, 62 Ill.Dec. 619, 436 N.E.2d 645.)   It is commonly said that "an account stated must demonstrate the mutual assent of both creditor and debtor." *Allied Wire Products, Inc. v. Marketing Techniques, Inc*. (1981), 99 Ill.App.3d 29, 54 Ill.Dec. 385, 424 N.E.2d 1288.  However, this meeting of the minds usually results from one party rendering a statement of account to which the other party acquiesces.  *Motive Parts Co. of America, Inc. v. Robinson* (1977), 53 Ill.App.3d 935, 369 N.E.2d 119. The manner of acquiescence is not critical, and the meeting of the minds may be inferred from the parties' conduct and the circumstances of the case. When one party renders a statement of account to another, who retains it without objection for longer than is reasonable, an account stated is established. *LaGrange Metal Products,*; *Protestant Hospital Builders Club, Inc. v. Goedde* (1981), 98 Ill.App.3d 1028, 54 Ill.Dec. 399, 424 N.E.2d 1302; *Motive Parts Co*."

*Toth v Mansell,*566 N.E.2d 730 (1990)207 Ill. App.3d 665 (1st Div.)

To forestall the creation of an "account stated," the putative debtor need only assert itself, and point out any errors in the account within a "reasonable" time.  Banco, however, did not do

6

so. Instead, it waited for twenty months before issuing, through counsel, a ringing declaration that it "rejected" the claims being made against it.  (PT-E)

### b. An Effective Account Stated Creates A "New Promise To Pay" Which Resets The Statute Of Limitations Clock.

The 2008 accounts picked up where the immediately preceding accounts had left off, and rolled the debts and credits that those accounts established forward.  The previous accounts had been rendered in 1993, so there is a gap of fifteen years of so between the 2008 accounts and the previous ones.  Did the Liquidator improperly resurrect barred claims in his 2008 accounts? Only if Banco had chosen to make a timely objection.

> The rule to be deduced from the cases in this State, as well as elsewhere, is that an account stated is an acknowledgment of an existing condition of liability of the parties, from which the law implies a promise to pay the balance thus acknowledged to be due. [citations omitted.]  The Statute of Limitations is tolled by an implied promise to pay.

*Chase v. Bramhall*, 343 Ill. App. 171 (1951, 98 N.E. 2d 529.  "An 'account stated' may include claims of indebtedness otherwise barred by the statute of frauds or statute of limitations."  1 Ill. Law and Prac. Account Stated § 1 *citing Canadian Ace Brewing Co. v. Swiftsure Beer Service Co.,* 17 Ill. App. 2d 54, 149 N.E.2d 442 (1st Dist. 1958).  See, also, *Chase v. Bramhall*, 343 Ill. App. 171, 98 N.E. 2d 529 (1951).

### c. Banco Received Each Of The Billing Statements Issued By Pine Top And The Liquidator in 2008, And Made No Substantive Objection To Them Until 2010.  Further, It Made No Effort To Exercise Its Contractual Right To Inspect Pine Top's Records Until After The Estate Of Pine Top Was Closed And This Suit Commenced.

While it remained in business, Pine Top provided quarterly accounts, more or less on schedule, to its reinsurers, including Banco.  When those accounts showed balances due, Banco paid them.  However, after the entry of its order of liquidation, the Liquidator prioritized responses to policyholder claims and the marshalling of assets to pay them with.  Nevertheless,

7

the Liquidator issued several billing statements to Banco, at irregular intervals when more pressing work permitted, including in 1989, 1990, 1992 and 1993. Banco duly recorded these in its own records, but did not pay them. The Liquidator's accounts were based on reports provided by Pine Top's own reinsureds; during this time period Pine Top was not permitted to actually pay reinsured claims because the claims of policyholders had not yet been paid or provided for.

The last date for filing claims against Pine Top was in January of 1989; claimants could update information regarding their claims until January of 1992. In October of 1993, following considerable motion practice carried out by concerned cedents and reinsurers, the liquidation court established a procedure for determining the valuation of cedents's claims (the primary source of reinsurance claims against companies like Banco). The majority of those claims were finally resolved in time to permit the Liquidator to issue final billing statements to reinsurers, including Banco, in July of 2008. The letter accompanying those statements (Exhibit PT-A) made it clear that this represented the final amount that would be due from Banco after all debits and credits had been taken into account.

Banco received the 2008 statement (as well as the other post-liquidation ones.) Rocha Deposition 26:17-28:21 and Exhibits 6-9 and 11-22. It made no direct response. *Id.* 28:17-21. Thirteen months later, however, Cheryl Topham-Coffee, a representative of the Liquidator, emailed Robert Badgley, whom she believed might represent Banco, (and who is actually representing Banco here)to inquire about its position vis-à-vis Pine Top. Four months later, Mr. Badgley responded with a letter which represented that Banco was "investigating" the reinsurance claims. Rocha Ex. 24. This was the first time that anyone representing Banco communicated to the Liquidator the possibility that Banco had an objection to the 2008 accounts (Rocha Dep. 32:14-33:5) – or for that matter any of the accounts issued since liquidation. The

8

Liquidator's staff promptly responded with materials meant to address the points raised in Mr. Badgley's letter. (Ex. PT-E)

Finally, on March 3, 2010, Mr. Badgley wrote to Ms Topham-Coffee. (Rocha Dep. Ex. 23). In that letter, although purporting to act under "a full reservation of rights," and without mentioning the materials provided by Ms. Topham-Coffee, he insisted that Banco still knew "next to nothing" about the reinsured claims. He declared Pine Top's claim to be "rejected in full," pointing generically to the statute of limitations and to unstated violations of unspecified treaty terms regarding notice of loss and reporting of reserves.

These assertions were half-truths, at best. At the deposition of Banco's representative Ms. Rocha, Banco did provide two extracts of its computer records (Rocha Ex. 4 and 5) which demonstrated that Banco had, in fact, received and entered into its accounting system each of the billings issued by Pine Top and its Liquidator, with the exception of that of 2008, which Ms Rocha admitted the company had received.[4]

### d. Banco Did Not Timely Object To The 2008 Accounts.

A debtor "acquiesces" to a proposed account stated if he receives the statement and does not object within a "reasonable time." How long is that? One might look to the provisions of the parties' contracts. All but one of the treaties here gave Banco one month from receipt of a statement to object – but provide that any adjustments resulting from an objection would be taken into the next quarterly account, rather than delaying Banco's obligation to pay. See, e.g. Banco Exhibit 14 at page 8 (PTREC 001084). The Excess of Loss Treaty was even more strict;

---

[4] The same spreadsheets also filled a nagging gap in the Liquidator's accounting records, by demonstrating that Banco had, in fact, paid each billing issued prior to liquidation. PTRIL had previously assumed that to be true, and has given Banco credit for all such payments.

9

the reinsurer must "abide by" Pine Top's loss settlements, and immediately pay its share upon being shown proof of the amount paid. Banco Ex 20, p. 9 (PTREC 1060)

The exigencies of liquidation certainly relaxed the standard for his accounting to Banco, and perhaps the same is true of Banco's obligations to Pine Top. But twenty months is a long time by anyone's yardstick. Banco has provided no reason why it could not have responded more promptly, or why its delay was "reasonable". PTRIL has, therefore, established an un-objected-to account stated. Its claims are not time-barred.

III. **The Liquidator's Accounts, In 2008 And Previously, Contained All The Detail Required By The Treaties And Customarily Provided By Pine Top. Banco Eschewed Its Right To Inspect The Liquidator's Records For Itself.**

Mr. Badgley's contention that the Liquidator had failed to provide Banco with sufficient information about the reinsured claims ignores the clear terms of its contracts. Each of the treaties contained a clause or clauses specifying the information to be included in the periodic accounts. For instance, in the Quota Share/First Surplus treaty, items to be included in the quarterly accounts are identified in Articles 3, 4, and 5. The Liquidator's accounts scrupulously adhered to these requirements, and often provided additional information.

The treaties clearly anticipate that the reinsurer will routinely receive only summary information. If it wishes more, it needs to ask. For instance, in the Quota Share/First Surplus treaty, Article 10 provides that (Banco Ex 15, PTREC-001123)

> Particulars of the acceptances to which this Agreement applies shall not be required by the Reinsurer but the books of the Company as far as they concern such acceptances shall be open to the inspection of any authorized representative of the Reinsurer at any reasonable time during the continuance of this Agreement or of any liability thereunder.

10

In short, the Liquidator provided the information required by the Treaties (and more). While that information was certainly concise, it was the information the parties had agreed would be sufficient. Any gaps could be filled if the reinsurer exercised its right to inspect Pine Top's books. Banco possessed, but did not choose to exercise, that right – at least not until after suit was filed.

In spite of Mr. Badgley's professed ignorance of the details of the reinsurance claims, and the fact that the 2008 accounts provided the same level of detail that had been provided in prior years (Rocha Dep. 38:23-40:23) no one on behalf of Banco requested access to Pine Top's records, nor did they submit any specific questions concerning the accounts.

**IV. The 2008 Account Ran In Banco's Favor – But Only If Banco's Claims To Recover Funds Previously Withheld By Pine Top, And Interest Thereon, Are Not Themselves Time-Barred. Time Bar, If It Applies, Applies To Both Parties.**

As Banco points out, the 2008 account statement, standing alone, actually reflects a change in Banco's favor. Banco does not, however, devote any attention to the source of this good news.

Unfortunately, Banco has not discovered a way to turn a debt into an asset. Banco was required, by the treaties as well as Illinois law, to provide collateral to secure its payment of obligations arising out of the treaties. It had elected to do so by permitting Pine Top to retain most of the premium it would otherwise have paid to Banco. These premiums were accounted for by Pine Top as "Funds Withheld" (for instance, see item "G" on Exhibit PT-D.) Since Pine Top ceased underwriting in 1985, all of the "Funds Withheld" represented premiums that were due to Banco in 1985 or earlier. Although both Banco and Pine Top understood that these premiums were owed to Banco, Banco has done nothing, from 1977 to the present, to recover them. If the Liquidator's pre-2002 claims against Banco are barred, then Banco's pre-2002

11

claims against Pine Top are likewise barred. If one removed both sides' pre-2002 claims from the 2008 accounting, Banco would owe PTRIL over $800,000.

A similar argument could be made for the millions of dollars of common account recoveries that the Liquidator also credited to Banco and its other reinsurers.

Banco cannot have it both ways. If Pine Tops claim's arising from accounts issued before 2008 are time-barred, so are Banco's. But the new claims incorporated in the 2008 accounts suffer from no such handicap.

## Conclusion

Plaintiff is in the business of buying reinsurance accounts receivable from parties who have gotten tired of trying to collect them. Sometimes they have failed in collection because the amounts aren't owed. That is a risk that PTRIL assumes, and does not shirk. But when a reinsurer who is capable of paying has simply hidden behind a wall of language, mileage, expensive lawyers and phoney defenses that it cannot substantiate, PTRIL is justified in pursuing its claims and is entitled to the benefit of its bargain. That is the case here.

Banco freely entered into these contracts. No doubt it has been disappointed in them. That happens in reinsurance; the commodity being traded is, after all, risk. But Banco may not claim the benefit of Illinois' statutes of limitation, because it could not be bothered to exert even the tiny effort needed to assert a timely and substantive objection to the Liquidator's account stated.

Banco's motion must be denied. The Illinois statutes of limitation do not bar PTRIL's claims.

Dated: March 9, 2016

                                                PINE TOP RECEIVABLES OF ILLINOIS, LLC

                                                By:/s/ Mary Cannon Veed

                                                One of its attorneys

Mary Cannon Veed
Mary Cannon Veed & Associates
838 South Garfield
Hinsdale, IL  60521
630-222-4030
mcv@veedlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on Marcy 10, 2016, I caused a true and correct copy of the foregoing PTRIL's RESPONSE TO MOTION FOR SUMMARY JUDGMENT to be served upon all interested parties by e-mail addressed as follows:

Ernesto Palomo
LOCKE LORD LLP
111 South Wacker Drive
Chicago, Illinois 60606
epalomo@lockelord.com

Robert A. Badgley
KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC
150 South Wacker Drive, Suite 1700
Chicago, IL 60606
rbadgley@karballaw.com

_____/s/ Mary Cannon Veed

Mary Cannon Veed

Mary Cannon Veed & Associates
838 South Garfield
Hinsdale, IL 60521
630-222-4030
mcv@veedlaw.com