# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PINE TOP RECEIVABLES OF ILLINOIS, LLC, )
a limited liability corporation, )
                                           )
         Plaintiff, )
                                           )
           v. )      No. 12 C 6357
                                           )      Hon. Marvin E. Aspen
BANCO DE SEGUROS DEL ESTADO, )
a statutory corporation wholly owned by the )
Sovereign Republic of Uruguay, )
                                           )
         Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Pine Top Receivables of Illinois, LLC ("PTRIL") filed this action against Defendant Banco de Seguros del Estado ("Banco") to recover sums allegedly owed to PTRIL from certain reinsurance contracts. Presently before us is Banco's motion for summary judgment. Banco contends that PTRIL's claims are untimely. As set forth below, we grant Banco's motion.

## BACKGROUND[1]

PTRIL is a limited liability corporation organized in Delaware, with a principal place of business in New York. (Def.'s SOF ¶ 1.) Banco is incorporated under the laws of Uruguay and maintains its principal place of business in that country's capital, Montevideo. (*Id.* ¶ 2.)

---

[1] Unless otherwise stated, the facts described herein are undisputed and culled from the parties' Local Rule 56.1 statements of fact and exhibits. We address any relevant evidentiary disputes as necessary. At times, the parties assert facts that are not supported by citations or materials in the record, and we generally disregard such assertions.

A.    **The Reinsurance Treaties**

Between 1977 and 1984, Banco and non-party Pine Top Insurance Company

("Pine Top") entered into at least five different reinsurance contracts, known as treaties

("Pine Top-Banco Treaties").  (*Id.* ¶ 5; Pl.'s SOF ¶ 1.)  Pursuant to the Pine Top-Banco Treaties,

and in exchange for consideration (i.e., premiums), Banco agreed to pay specified shares of Pine

Top's liabilities stemming from underlying contracts of insurance or reinsurance.  (Def.'s SOF

¶ 5.)  Given the nature of reinsurance,[2] "[e]ach of the treaties covered . . . commitments that

could be expected to continue to develop over many years."  (Pl.'s SOF ¶ 2.)  The five Pine Top-

Banco Treaties at issue in this case are: (1) the Quota Share-First Surplus Treaty; (2) the Variable

Quota Share Treaty; (3) the Quota Share Direct-Facultative Treaty; (4) the Quota Share

Reinsurance Treaty; and (5) the Excess of Loss Treaty.  (Def.'s SOF ¶ 5 & Exs. 14–20; *see also*

Pl.'s SOF ¶ 1.)

*1.    Accounting Procedures*

Each of the Pine Top-Banco Treaties includes a procedure by which the parties would

settle the transactions between them (including any credits and debits) on a regular basis.  (*See,*

*e.g.*, Def.'s SOF ¶¶ 19, 21, 23, 25, 27.[3])  We begin with the Quota Share-First Surplus Treaty, in

which Banco severally agreed to accept a 2% share of Pine Top's liabilities for all underwriting

years from 1977 to 1980.  (Def.s' SOF ¶ 18 & Exs. 14–16.)  Article 8 of Quota Share-First

_____

[2] For the unfamiliar, "reinsurance is . . . simply insurance for insurance companies."  *Cont'l Cas. Co. v. Stronghold Ins. Co., Ltd.*, 77 F.3d 16, 20 (2d Cir. 1996).  It "is a device whereby an insurance company that has assumed uncomfortable levels of risk buys insurance from another insurance company to assume some of those risks," thus spreading around the risk.  *Id.* at 17.

[3] PTRIL objects to Banco's characterization of these procedures as "mandatory."  (Pl.'s Resp. to Def.'s SOF ¶¶ 19, 21, 23, 25, 27.)  Yet PTRIL does not dispute the plain text of the documents.  Rather, it contends that the contractual procedures for quarterly and/or prompt reckoning conflict with the Illinois Insurance Code.  (*Id.*; *see also* Opp'n at 3–4; Sur-Reply at 5–6.)

Surplus Treaty[4] provides that "the accounts . . . shall be drawn up quarterly as at December 31st, March 31st, June 30th, and September 30th of each year." (Def.'s Ex. 16, art. 8, ¶ 1.) The accounts "shall be sent by [Pine Top] to [Banco] within three months of the end of each quarter." (*Id.*) Under the terms of the Quota Share-First Surplus Treaty, Banco had "one month from the date of receipt of the accounts either to confirm agreement or to make any observations relative thereto." (*Id.*, art. 8, ¶ 3.) Either way, the balance from each quarterly accounting was to "be settled by the debtor party within three months of the end of each such quarter." (*Id.*, art. 8, ¶ 1.) In each iteration, the Quota Share-First Surplus Treaty stated that, at that point, "the balance shown in the accounts shall become payable by the debtor party . . . and any corrections becoming necessary as a result of error on the part of [Pine Top] shall be adjusted in the next account." (*Id.*, art. 8, ¶ 4.)

In the Quota Share Reinsurance Treaty, Pine Top agreed to cede, and Banco severally agreed to accept, a 2% share of Pine Top's liabilities for all underwriting years from 1981 to 1983. (Def.'s SOF ¶ 24 & Ex. 19.) Article 8 of the Quota Share Reinsurance Treaty includes terms identical to those found in Article 8 of the Quota Share-First Surplus Treaty. (Def.'s SOF ¶¶ 24–25 & Ex. 19, art. 8.) That is, the Quota Share Reinsurance Treaty sets forth the same quarterly accounting procedure described above.

The Variable Quota Share Treaty involved a 3.85% share of Pine Top's liabilities and includes similar language. (Def.'s SOF ¶ 20.) Article 5 of the Variable Quota Share Treaty states that the "accounts . . . shall be drawn up quarterly as at September 30th, December 31st, March 31st, and June 30th of each year." (Def.'s Ex. 17, art. 5, ¶ 1.) The accounts shall be sent

---

[4] The Quota Share-First Surplus Treaty for each year is memorialized by separate agreement. (*See* Def.'s Exs. 14–16.) The language of Article 8 is substantially similar among each of the agreements, and, like the parties, we refer to the Quota Share-First Surplus Treaty in the singular.

3

by Pine Top "within 30 days of the end of each such quarter." (*Id.*) "The balance due by either party shall be paid within 45 days of the end of the quarter." (*Id.*; *see also* Def.'s SOF ¶¶ 20–21.)

The Quota Share Direct-Facultative Treaty also includes very similar provisions. The Quota Share Direct-Facultative Treaty involved a 6.5% share of Pine Top's liabilities, for the 1981 through 1983 underwriting years. (Def.'s SOF ¶ 22 & Ex. 18.) Article 8 of the Quota Share Direct-Facultative Treaty requires the accounts to "be drawn up quarterly as at March 31st, June 30th, September 30th, and December 31st of each year." (Def.'s Ex. 18, art. 8, ¶ 1.) Those accounts "shall be sent by [Pine Top] to [Banco] within three months of the end of each quarter." (*Id.*) Under the terms of the Quota Share Direct-Facultative Treaty, Banco had "one month from the date of receipt of the accounts either to confirm agreement or to make any observations relative thereto." (*Id.*, art. 8, ¶ 3.) In any event, the balance from each quarterly accounting was to "be settled by the debtor party within three months of the end of each such quarter." (*Id.*, art. 8, ¶ 1; *see id.* art. 8, ¶ 4; *see also* Def.'s SOF ¶ 23.)

Finally, the Excess of Loss Treaty established a procedure governing the reinsurer's payment obligation. (Def.'s SOF ¶ 26.) This contract did not mandate a quarterly accounting, however. (*Id.*) Instead, Article 14 of the Excess of Loss Treaty required Pine Top to "give notice as soon as reasonably practicable" to Banco through the designated intermediary "[i]n the event of a loss occurrence which either results in or appears to be of serious enough nature as probably to result in a loss involving" the treaty. (Def.'s SOF ¶ 27 & Ex. 20, art. 14, ¶ 1.) In the Excess of Loss Treaty, Banco agreed to "abide by the loss settlements" as determined by Pine Top once Pine Top provided "reasonable evidence of the amount" that it had paid out. (Def.'s Ex. 20, art. 14, ¶ 2.) Pursuant to this provision, and as a PTRIL witness has

acknowledged, Banco's share of the Pine Top losses therefore became "immediately due" under the Excess of Loss Treaty once Pine Top submitted proof of its own underlying payments to the parties' designated intermediary. (*Id.*; Def.'s SOF ¶ 27; *see* Def.'s Ex. 7 (Scognamiglio Dep) at 121–24.)

Despite the contractual language setting up these accounting procedures, the same PTRIL witness, Joseph Scognamiglio, testified that the reinsurance industry follows its own customs, particularly when an entity becomes insolvent. At his deposition, Scognamiglio acknowledged that he had the "impression" that the Pine Top-Banco Treaties required these regular billings. (Scognamiglio Dep. at 105; *see also id.* at 116–24 (discussing the billing and payment procedures).) He explained, however, that the parties to such contracts typically do not comply with those accounting provisions once a party enters liquidation. (*Id.* ("Once in liquidation I know from experience they often don't.").) Scognamiglio testified that, based on his experience, "in the context of a liquidation," "these [terms] are not literally followed." (*Id.*; *see also id.* at 126–27 (stating that although he didn't see any language about it in the documents, the parties wait to settle accounts "all the time in the run-off business").

### 2. *Notice Procedures*

In addition to the accounting procedures, each of the Pine Top-Banco Treaties prescribed how correspondence should be transmitted between the parties. (Def.'s SOF ¶ 30.) For example, the Quota Share-First Surplus Treaty (and three others) provides that "[a]ll communications (including but not limited to notices, statements, premiums, return premiums, commission, taxes, losses, loss adjustment expense, salvage, and loss settlements) . . . shall be transmitted to [Pine Top] or [Banco] through H.A. Enan & Co. (Reinsurance) Ltd.," the recognized intermediary. (Def.'s Ex. 16, art. 16; *see also* Def.'s Ex. 18, art. 17 (setting forth

identical language in the Quota Share Direct-Facultative Treaty); Def.'s Ex. 19, art. 17 (same as to the Quota Share Reinsurance Treaty); Def.'s Ex. 20, art. 22 (same as to the Excess of Loss Treaty).) These four treaties also establish that payments by Banco through the designated intermediary "shall only constitute payment to [Pine Top] to the extent that such payments are actually received by [Pine Top.]" (Def.'s Ex. 16, art. 16.; *see also* Def.'s Ex. 18, art. 17; Def.'s Ex. 19, art. 17; Def.'s Ex. 20, art. 22.) As for the fifth treaty, the Variable Quota Share Treaty states that "[a]ll correspondence and documents . . . shall be forwarded to le blanc Eldridge Parizeau (International), Inc.," deemed "the intermediaries for" that agreement. (Def.'s Ex. 17, art. 12.) The language of the Pine Top-Banco Treaties thus did not contemplate communication directly between Pine Top and Banco.

Consistent with these provisions, "[f]rom 1977 through about 1993, all transactions from Pine Top to Banco (and vice versa) passed through at least four different entities." (Def.'s SOF ¶ 31.) As Banco describes the process, "a document originating from Pine Top and destined for Banco was sent first to the treaty intermediary."[5] (*Id.*) The intermediaries, who are Pine Top's agents, then "would have sent the correspondence to a sub-broker," Leslie & Godwin International, Inc. ("Leslie"). (*Id.* ¶¶ 32–33.) Leslie would then "send the correspondence to Argenhall, a broker used by Leslie to place business with South American reinsurers." (*Id.* ¶ 34.) Argenhall would forward the correspondence on to Banco. (*Id.* ¶ 35.) If Banco sought to pay

---

[5] In response to Banco's Local Rule 56.1 statements, PTRIL states that it lacks knowledge sufficient to admit or deny some of these facts. The source material cited by Banco—the deposition testimony of Anthony Peck—supports its assertions, and we deem these facts admitted. (Def.'s SOF ¶¶ 31–36.) Peck further testified, similar to Scognamiglio, that these notice procedures customarily would be set aside by the parties if a company went into liquidation. (Def.'s Ex. 3 (Peck Dep.) at 129–31.) Peck and Scognamiglio are consultants for PTRIL. (*Id.* at 8.)

Pine Top, the process set forth in the Pine Top-Banco Treaties would flow in reverse, beginning with Banco's transmission to Argenhall.  (*Id.* ¶ 36; *see* Peck Dep. at 144.)

## B.    Pine Top's Liquidation

In 1985, Pine Top ceased underwriting, and it went into receivership in January 1986. (Pl.'s SOF ¶ 3.)  An Illinois court placed Pine Top into liquidation on January 16, 1987.  (*Id.*; Def.'s SOF ¶ 6; *see also* Def.'s Ex. 2 (1/16/87 Final Order (appointing a liquidator due to Pine Top's insolvency).)  The court vested the liquidator with the "interest in all funds recoverable under treaties and agreements of reinsurance heretofore entered into by or on behalf of Pine Top."  (1/16/87 Final Order at 3.)  The court-appointed liquidator was "authorized and directed to wind-down and terminate Pine Top's business."  (1/16/87 Final Order at 6.)

From 1983 through November 1993, either Pine Top or the liquidator (once appointed) "sent at least 132 account statements to Banco through the intermediaries designated in the Pine Top-Banco treaties."  (Def.'s SOF ¶ 7.)  PTRIL notes that Pine Top issued its last quarterly statements in late 1986 and early 1987.  (Pl.'s SOF ¶ 4.)  Between November 5, 1993 and July 30, 2008, however, the liquidator "did not send any new accounts statements to Banco" under four of the five treaties.[6]  (Def.'s ¶ 8.)  According to PTRIL, though somewhat disputed by Banco, the liquidator sent no statements during this fifteen-year period because there was little activity to report.  (Pl.'s SOF ¶¶ 11–12; *see* Peck Dep. at 42–43 (describing what the liquidator would have done to adjust policyholder claims and reinsurance class claims).  PTRIL asserts that, once the liquidator disposed of the cedent creditor claims, he could finally report back to Pine Top's reinsurers as to their liabilities.  (Pl.'s SOF ¶ 15.)

---

[6] Apparently some account statements were issued with respect to the Variable Quota Share Treaty.  (Def.'s SOF ¶ 8; *see* Mem. at 3 n.3 (asserting that Pine Top owes Banco under this treaty).)

On July 31, 2008, the liquidator sent a new bill[7] to Banco, which included two components. First, the bill presented the account balance for claims booked by the liquidator from 1993 to July 1999. (Def.'s SOF ¶ 9; *see also* Def.'s Ex. 8 (7/31/08 Bill).) It is undisputed that the calculation for this time period showed a balance owed to Banco, not to Pine Top. (Def.'s SOF ¶ 9; 7/31/08 Bill (showing $227,750.55 credit due Banco for 1993 through July 1999).) Second, the bill included a summary statement for all earlier notices and requested payment for all unsettled amounts accrued from inception of the Pine Top-Banco Treaties through June 1993. (Def.'s SOF ¶ 9.) According to the July 31, 2008 bill, Banco owed Pine Top a total of $2,262,770.42, which represented the unpaid account statements prior to 1993 minus the credit due to Banco for the 1993 through July 1999 period. (7/31/08 Bill at 2.)

PTRIL contends that this bill was intended to be a final statement of all accounts between the parties. (Pl.'s SOF ¶¶ 18–19.) PTRIL also asserts that "Banco received the accounts shortly after their date of July 31, 2008" and yet did not object until March of 2010. ((Pl.'s SOF ¶ 20; *see also* Sur-Reply at 9–10 & n.5 (arguing that Banco's representative admitted that the bill had been received).)

Banco disputes that claim, however, arguing that PTRIL has failed to offer evidence of when the July 31, 2008 bill was received by Banco in Montevideo. (Def.'s Resp. to Pl.'s SOF ¶ 20; *see also id.* ¶¶ 18–19 (also disputing PTRIL's legal characterization of the 7/31/08 Bill as an "account stated").) Banco concedes that it received a copy of the July 31, 2008 bill. It denies, however, that it received the bill "shortly after" the liquidator's mailing. (*Id.*; *see also* Def.'s Resp. to Pl.'s SOF ¶ 15 (admitting that the letter was sent "on or about July 31, 2008").)

---

[7] The communication dated July 31, 2008 apparently included a package of billings, but we refer to them in the singular. (Def.'s SOF ¶ 9 (stating that the liquidator sent fifteen bills); *see also* Def.'s Ex. 30 (Rocha Dep.) at 27–28 (acknowledging that Banco received a package of billings directly from the liquidator).)

According to Banco, the evidence in the record shows that it did not receive a signed copy of the July 31, 2008 letter until February of 2010. (*Id.*; *see also* Def.'s Ex. 8.) Prior to that date, Banco's counsel received an unsigned copy of the letter in an email from the liquidator's office (specifically, from Cheryl Topham-Coffee) on September 24, 2009. (Def.'s Resp. to Pl.'s SOF ¶ 20; *see also* Def.'s Ex. 39 (1/20/10 Ltr. from Banco's counsel to Topham-Coffee, referencing receipt of the 7/31/08 Bill in her 9/24/09 email).) Banco suggests that it had no knowledge of the July 31, 2008 bill until late 2009 and that it promptly objected thereafter in early 2010. (Def.'s Resp. to Pl.'s SOF ¶ 20; Def.'s Ex. 9 (3/3/10 Letter to Topham-Coffee, declining to pay) & Ex. 39 (1/20/10 Letter to Topham-Coffee acknowledging receipt of her 9/24/09 email, reserving its right to deny the claims, and advising that it considers the claims stale); *see, e.g.*, Pl.'s Ex. E (copies of some of the parties' communications from 9/24/09 through 2/23/10).) Banco refused to pay or negotiate with the liquidator.

### C. PTRIL's Lawsuit

On November 16, 2010, PTRIL bought Pine Top's reinsurance receivables from the liquidator. (Def.'s SOF ¶ 11 & Ex. 10 (Purchase Agreement and Assignment of Debt ("Purchase Agreement")).) In the Purchase Agreement, the liquidator assigned PTRIL "all of its rights, title, benefit and interest in the Debts absolutely and with full title." (Purchase Agreement, ¶ 2.1; *see also id.* ¶ 1.1 & Schedule 1 (defining "Debts" as "[t]he net balances due as at November 4, 2010" to the liquidator from the debtors, including Banco).)

PTRIL filed this lawsuit on August 11, 2012, seeking to collect the payments allegedly owed by Banco under the Pine Top-Banco Treaties.[8] We previously dismissed two of the three

---

[8] PTRIL also sought to: (1) require Banco to post pre-judgment security; and (2) compel arbitration of its claims. We denied those requests, and the Seventh Circuit affirmed our holdings. (*See* Dkt. Nos. 28, 55, 95, 127.)

claims raised in PTRIL's amended complaint, but the breach of contract claim remains.

(Dkt. No. 95.)  Banco filed the instant motion on February 18, 2016, contending that PTRIL's

contract claims are time-barred.

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine

issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505,

2510 (1986).  This standard places the initial burden on the moving party to identify those

portions of the record that "it believes demonstrate the absence of a genuine issue of material

fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal

quotations omitted).  Once the moving party meets this burden of production, the nonmoving

party "must go beyond the pleadings" and identify portions of the record demonstrating that a

material fact is genuinely disputed.  *Id.*; Fed. R. Civ. P. 56(c).

In deciding whether summary judgment is appropriate, we must accept the nonmoving

party's evidence as true, and draw all reasonable inferences in that party's favor.  *Anderson*, 477

U.S. at 255, 106 S. Ct. at 2513.  We do not "judge the credibility of the witnesses, evaluate the

weight of the evidence, or determine the truth of the matter.  The only question is whether there

is a genuine issue of fact."  *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing

*Anderson*, 477 U.S. at 249–50, 106 S. Ct. at 2511).  "Where the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for

trial."  *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 970 (7th Cir. 2004) (citations omitted).

**ANALYSIS**

Banco's motion focuses on the applicable statute of limitations for PTRIL's claims. (*See* Opp'n to Sur-Reply at 6 (acknowledging that, for purposes of summary judgment only, Banco is relying on the statute of limitations argument); *see also* Mem. at 1–2 (listing various additional reasons why Banco should prevail).) Banco asserts, and PTRIL does not dispute, that the applicable statute of limitations in Illinois for PTRIL's contract claims is ten years.[9] (Mem. at 7.) *See* 735 ILCS 5/13-206 (governing the limitations period for actions based on written contracts). We thus begin our analysis by asking when the ten-year clock began to run on PTRIL's claims, and if it expired. Once we have answered those questions, we can consider, as PTRIL contends, whether other circumstances may have arisen to save PTRIL's claims.

### A.       Application of the Statute of Limitations to PTRIL's Contract Claims

In the motion, Banco argues that PTRIL's contract claims accrued pursuant to the terms of the Pine Top-Banco Treaties. (Mem. at 5–10.) As mentioned earlier, each of the treaties included a provision governing how the parties would settle transactions between them. Four of

---

[9] That being said, the parties acknowledge that the Quota Share-First Surplus Treaty covering the 1977 and 1978 underwriting year calls for the application of Arizona law, not Illinois law. (Def.'s SOF ¶ 29 & Ex. 14, art. 16.) We note that the statute of limitations governing written contracts in Arizona is six years—significantly shorter than the Illinois period. A.R.S. § 12-548(A)(1); *see also* A.R.S. § 12-543 (providing a three-year statute of limitations on claims for account stated); *Newberry Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1404 (9th Cir. 1996) (describing claims for an account stated under Arizona law). The Illinois Supreme Court has stressed that "[a] choice-of-law determination is required only when a difference in law will make a difference in the outcome." *Townsend v. Sears, Roebuck & Co.,* 227 Ill.2d 147, 155, 879 N.E.2d 893, 898 (Ill. 2007); *Allianz Ins. Co. v. Guidant Corp.*, 373 Ill. App. 3d 652, 658, 869 N.E.2d 1042, 1049 (2d Dist. 2007). In other words, Illinois choice-of-law principles dictate that, in the absence of an actual conflict, Illinois substantive law shall govern as the law of the forum. *SBC Holdings, Inc. v. Travelers Cas. & Sur. Co.,* 374 Ill. App. 3d 1, 13, 872 N.E.2d 10, 21 (1st Dist. 2007). Moreover, "even where the substantive law of a nonforum state applies, Illinois courts apply the Illinois statute of limitations." *Ennegna v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012) (internal quotation omitted). As we do not perceive—and the parties have not identified— any conflict between Arizona and Illinois law that might affect the outcome of this case, we apply Illinois law.

the five treaties mandated quarterly account statements, with Banco typically required to either pay or object to the statements within a set time after receipt thereof. (Def.'s Exs. 14–19.) These four treaties provided that the party with a balance from a particular quarter would satisfy that balance, typically within three months of the end of the quarter. (*Id.*) Under the fifth agreement, the Excess of Loss Treaty, the balance became "immediately due" once Pine Top provided proof to the designated intermediary of its underlying loss payment. (Def.'s Ex. 20, art. 14.) Based on these terms, and as Scognamiglio acknowledged, payments under the Pine Top-Banco Treaties became due either within a short time after the quarterly accounting or immediately upon Pine Top's proof of loss under the Excess of Loss Treaty. (Pl.'s Resp. to Def.'s SOF ¶¶ 18–27; *see* Scognamiglio Dep. at 105, 116–24.) Consistent with this evidence, Banco contends that PTRIL's contract claims thus accrued—and the limitations period began—once payments became due under the contractual language.

In support of its motion, Banco cites to several cases for the commonsense proposition that claims brought for breach of reinsurance treaties accrue under the contractual terms governing account billing. (Mem. at 7–10.) *See Cont'l Cas. Co.*, 77 F.3d at 19–20; *see also Republic Ins. Co. v. Banco de Seguros del Estado*, 10 C 5039, 2013 WL 3874027, at *5, 10–11 (N.D. Ill. July 26, 2013) (holding that, under governing law, the "six-year statute of limitations began by virtue of the contract billing provision"); *OneBeacon Ins. Co. v. Aviva Ins. Ltd.*, 10 C 7498, 2013 WL 2147958, at *4–6 (E.D. Pa. May 17, 2013) (finding that the limitations period began on reinsurance claims when defendant received and validated periodic accounting reports, subject only to the parties' standstill agreement); *Gerling Global Reins. Co. v. Safety Mut. Cas. Co.*, 79 C 4422, 1980 U.S. Dist. Lexis 12078, at *4–5 (S.D.N.Y. June 26, 1980) (holding that the "cause of action for any shortfall in these quarterly payments from a breach of

contract accrued on the date each quarterly payment became due"); *Transport Ins. Co. v. TIG Ins. Co.*, 202 Cal App. 4th 984, 987–92, 136 Cal. Rptr. 3d 315, 317–21 (Cal. Ct. App. 2012) (discussing evolution of reinsurance claims and relying on *Continental Casualty Company* in concluding that "all issues are fair game, including statutes of limitations"). Although these cases do not interpret Illinois law, we find their reasoning persuasive.[10]

With that principle in mind, we turn to the accounts in question.[11] In its motion, Banco points out that, prior to the July 31, 2008 bill, the most recent statement issued by the liquidator was dated November 5, 1993. (Mem. at 8–9; Def.'s SOF ¶¶ 7–8 & Ex. 6.) Under the terms of the Pine Top-Banco Treaties, the balances described in that statement became due and payable no later than three months later, in early 1994. The claims thus accrued in early 1994, and the statute of limitations ran ten years later, in early 2004. PTRIL did not file this action until August 11, 2012, more than eight years past the deadline for suit on a written contract. We agree with Banco that PTRIL's contract claims are thus untimely.

For its part, PTRIL does not directly address Banco's argument. Instead, PTRIL advances a more novel theory. PTRIL contends that, in this case, its claims could not accrue as set forth by the Pine Top-Banco Treaties because of Pine Top's entrance into liquidation. (*See* Opp'n at 3–5; Sur-reply at 2, 5–6.) PTRIL relies on a provision of the Illinois Insurance Code, which states that, in the liquidation context, "[i]n all cases of mutual debts or mutual credits . . . such credits and debts shall be set off or counterclaimed and the balance only shall be allowed or

---

[10] We need not address this line of cases in detail, moreover, because PTRIL has not attempted to attack their rationale. PTRIL relies on another argument entirely, which we address in turn.

[11] Recall that the July 31, 2008 bill shows a credit to Banco for claims booked between 1993 and July 1999. As a result, PTRIL has no claim for that time period. (PTRIL now objects to that conclusion, an issue we address later in this opinion.) Accordingly, we focus our attention on the timeliness of PTRIL's claims for the balance allegedly due it from unsettled amounts accrued prior to June 1993.

paid." 215 ILCS 5/206. According to PTRIL, all "mutual debts or mutual credits" between Pine

Top and Banco had to be sorted out in the protracted and complicated liquidation proceeding, so

that the parties could take advantage of this set-off provision. (Opp'n at 4–5; Sur-Reply at 5–6.)

As PTRIL explains, it made sense for the parties to wait out the liquidation proceedings to

maximize their recovery, but, by the same token, the set-off provision "disabled the [l]iquidator

from pursuing claims against Banco." (Sur-Reply at 6.) PTRIL witnesses' testimony generally

supports this theory, demonstrating that, as a practical matter, neither the quarterly accounting,

nor notice provisions, of reinsurance treaties are typically followed once an entity enters

liquidation. (*See* Peck Dep. at 129–31; Scognamiglio Dep. at 104–05, 116–27.) In short, PTRIL

admits that the set-off statute did not "toll" the limitations period but contends that the statute

"postponed" the accrual date for the pending claims until the liquidator had ascertained the

parties' ultimate status in 2008. (Sur-Reply at 5.)

PTRIL's position certainly has intuitive appeal. Based on PTRIL's description of the

liquidation proceedings, it seems logical that the parties might want to wait until the liquidator

determined "the winners and losers," so to speak, before taking any legal action. (Opp'n at 5;

*see* Sur-Reply at 6 & nn.2–3.) The little we know of industry custom comports with such an

approach. (*See* Peck Dep. at 129–31; Scognamiglio Dep. at 104–05, 116–27.) It appears,

moreover, that insurance companies historically did not raise statute of limitations defenses

against each other in the reinsurance context. *See, e.g.*, *Cont'l Cas. Co.*, 77 F.3d at 22 ("Because

custom and usage have established a gentility and unity of interest between the reinsured and its

reinsurer, . . . a generation ago, we doubt that the defendants would even have considered

asserting a statute of limitations defense."); *Republic Ins. Co.*, 2013 WL 3874027, at *6 n.4

(noting that "[c]onsistent with the practice of some underwriters . . . claims against the other

quota share treaty participants were settled without the invocation of the statute of limitations"); *Transport Ins. Co.*, 202 Cal App. 4th at 991, 136 Cal. Rptr. 3d at 320–21 (citing *Continental Casualty Company* for the notion that "centuries of history have treated both [parties] as allies, rather than adversaries").

Nonetheless, we find that PTRIL's argument lacks merit for two reasons. First, PTRIL cites no precedent holding (or even implying) that the liquidation set-off provision operates to delay accrual of otherwise ripe contract claims or to blunt the impact of a general statute of limitations in any way. (*See* Opp'n at 3–5 (citing only the Insurance code); Sur-Reply at 5–6 (same).) This omission constitutes forfeiture. *See, e.g.*, *Beverly v. Abbott Labs.*, 817 F.3d 328, 334 (7th Cir. 2016) (failure "to cite a single case" in support of contention "amounts to forfeiture"); *United Central Bank v. Davenport Estate LLC*, 815 F.3d 315, 318 (7th Cir. 2016) (failure to "cite any applicable legal authority or provide support" results in waiver); *Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008) (failure to cite authority renders argument "perfunctory and undeveloped"). Additionally, although PTRIL emphasizes the tension between the practicalities of liquidation and the statute of limitations, PTRIL has not convinced us that this tension creates an actual conflict that, moreover, warrants the novel remedy of indefinitely elevating the insurance set-off provision above the well-established statute of limitations.[12] [13]

---

[12] Banco points out that the set-off provision includes its own statute of limitations. (Mem. at 12–13.) 215 ILCS 5/194(c). The statute provides that the liquidator "may, within 2 years after the entry of an order for . . . liquidation or within such further time as applicable law permits, institute an action . . . upon any cause of action against which the period of limitation fixed by applicable law has not expired at the time of the filing of the complaint upon which the ordered is entered." *Id.* This subsection does not support PTRIL's theory. To the contrary, it suggests that the set-off provision defers to other limitations periods when applicable. It further suggests that the liquidator could have initiated legal action against Banco many years ago.

Second, PTRIL's approach disregards the undisputed, clear terms of the Pine Top-Banco Treaties governing the debts at issue. While we appreciate the quandary facing parties to a liquidation proceeding, neither that quandary, nor industry practice, rationalize ignoring the Pine Top-Banco Treaties and the statute of limitations. Indeed, under Illinois law, we may not consider extrinsic evidence—such as industry custom or practice—if the terms of the contract are facially unambiguous, as they are here.[14] *See Nanoexa Corp. v. Univ. of Chi.*, 10 C 7177, 2011 WL 1399264, at *3 (N.D. Ill. Apr. 13, 2011); *Ruthman v. Guarantee Ins. Agency Co.*, 89 Ill. App. 3d 997, 999, 412 N.E.2d 697, 698 (1st Dist. 1980).

In sum, we hold that the Pine Top-Banco Treaties govern the date on which the claims accrued, without regard to Pine Top's liquidation.[15] Consistent with the contractual terms, the claims at issue accrued in early 1994, triggering the statute of limitations, which then ran

---

[13] We add that Illinois courts, on very different facts, have held that another limitations period set forth in the Insurance Code does not toll the limitations periods applicable to contracts. *See, e.g.*, *IPF Recovery Co. v. Ill. Ins. Guar. Fund*, 356 Ill. App. 3d 658, 826 N.E.2d 943 (1st Dist. 2005) (holding that the limitations period set forth in 215 ILCS 5/143.1 did not toll the applicable five-year period); *Dial Corp. v. Marine Office of Ams.*, 318 Ill. App. 3d 1056, 743 N.E.2d 621 (1st Dist. 2001) (holding that same period did not toll the ten-year limitations period).

[14] Even if we considered industry practice, it appears that the "gentility and unity of interest" that prevailed decades ago in the reinsurance industry may have been lost over time due to extenuating circumstances. *See Cont'l Cas. Co.*, 77 F.3d at 22 (commenting, in 1996, that "[w]ith the collapse of prominent British reinsurers, and the financial distress of Lloyd's of London, times may have changed"); *Transport Ins. Co.*, 202 Cal App. 4th at 990–92, 136 Cal. Rptr. 3d at 320–21 ("For a variety of reasons, including the sheer enormity of actual and potential liability for environmental and other claims and a series of insolvencies hitting both insurers and reinsurers, all that now has changed.") (internal quotation omitted).

[15] The Pine Top-Banco Treaties acknowledge the possibility that a party may become insolvent. (*See, e.g.*, Def.'s Ex. 16, art. 12–13; Def.'s Ex. 17, art. 9–10; Def.'s Ex. 18, art. 13–14; Def.'s Ex. 19, art. 13–14; Def.'s Ex. 20, art. 18–19.) Generally speaking, they permit either party to terminate the agreement and dictate how the parties shall treat premiums in that event. The agreements do not eliminate the regular accounting requirements upon insolvency, nor does PTRIL argue as much. To the extent that PTRIL contends that the parties waived the billing requirements after the liquidation, as mentioned in a footnote in PTRIL's sur-reply, we decline to address that undeveloped argument. (Sur-Reply at 4 n.1.)

in 2004.  PTRIL's contract claims, filed in 2012, are time-barred.  We hereby grant summary judgment on the breach of contract claims in favor of Banco.

### B.    Application of the Statute of Limitations to Funds Withheld by PTRIL

In response to the motion for summary judgment, PTRIL contends that if the statute of limitations bars its pre-1993 claims, as we have found, then it also operates to eliminate the credit owed to Banco as reflected on the July 31, 2008 bill.  (Opp'n at 11–12; Sur-Reply at 11–13.)  According to PTRIL, "[t]he 2008 accounts, which are certainly not time-barred, reflected new obligations of Banco in excess of $785,000, but also gave Banco credit for $738,000 in funds which Pine Top had been holding as security, together with $341,000 of interest on those funds, which had been accumulating since 1987."  (Sur-Reply at 11.)  PTRIL argues that "[i[f one removed both sides' pre-2002 claims from the 2008 accounting, Banco would owe PTRIL over $800,000."[16]  (Opp'n at 12 (arguing that "Banco cannot have it both ways").)  In other words, if the statute of limitations applies mutually to Banco's credits for old premiums and interest, it requires PTRIL to apply Banco's credits to the old claims, rather than applying that collateral to the newer claims.  As a result, if we reallocate that approximately $1,079,000 credit, Banco then owes PTRIL roughly $800,000 for the new, timely claims asserted in the July 31, 2008 bill.

As with its insurance set-off argument, we find that PTRIL's position is utterly unsupported.  For example, PTRIL has not explained—with record or legal citations—how the

---

[16] In its sur-reply, PTRIL clarifies that the amount due PTRIL would be "roughly $785,000." (Sur-Reply at 11.)  Although PTRIL asks that we grant it additional time to provide an affidavit from Peck as to these figures, we deny that request.  (*Id.* at 11 n.6.)  We have already permitted PTRIL to file a sur-reply, and it is too late in the day for additional evidentiary submissions or briefing.

retention of the premiums works under either the Pine Top-Banco Treaties or applicable law.[17]

PTRIL has not provided any factual or legal authority addressing how the premiums were to be applied, when rights associated with the premiums would have accrued, or what statute of limitations applies to any such rights.  PTRIL simply asserts that it can now reapply the credits per the ten-year statute of limitations, even though the liquidator already applied them in the July 31, 2008 billings so as to give Banco a credit against the recent claims.  (Neither party addresses why the liquidator applied the credits that way, whether it was erroneous, or whether PTRIL can override that decision at this point.)  PTRIL cites no cases directly addressing its theory or instructing how to begin analyzing it.  (Opp'n at 11–12; Sur-Reply at 11.)  We are left with the impression that PTRIL's theory is much more complicated than advertised.

As the Seventh Circuit has repeatedly stated, "[p]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."  *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010); *de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 688 (7th Cir. 2008); *U.S. v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006); *see Starks v. City of Waukegan*, 123 F. Supp. 3d 1036, 1061–62 (N.D. Ill. 2015); *Merry Gentlemen, LLC v. George & Leona Prods., Inc.*, 76 F. Supp. 3d 756, 764–66 (N.D. Ill. 2014).  We find that PTRIL has waived this theory by failing to adequately articulate and support it with legal authority and record citation. *Merry Gentlemen, LLC*, 76 F. Supp. 3d at 765 (holding that plaintiff forfeited its claim because it was "wholly undeveloped"); *Northbound Grp., Inc. v. Norvax, Inc.*, 5 F. Supp. 3d 956, 973–74

---

[17] As noted earlier, the Pine Top-Banco Treaties contemplate that a party may become insolvent. (*See, e.g.*, Def.'s Ex. 16, art. 12–13; Def.'s Ex. 17, art. 9–10; Def.'s Ex. 18, art. 13–14; Def.'s Ex. 19, art. 13–14; Def.'s Ex. 20, art. 18–19.)  The four quota share treaties (but not the Excess of Loss Treaty) provide that, in that event, "[Pine Top] shall have the option to retain premiums written subsequent to the effective date of termination."  (Def.'s Ex. 16, art. 12; *see also* Def.s' Ex. 17, art. 9; Def.'s Ex. 18, art. 13; Def.'s Ex. 19, art. 13.)  As far as we can tell, the treaties do not offer further instruction on the retention or disposition of withheld premiums.

(N.D. Ill. 2013) (finding theories waived because they were "not sufficiently articulated or supported"). Furthermore, it is not our job "to research and construct legal arguments open to the parties." *Judge*, 612 F.3d at 557 (citing *U.S. v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003)); *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011) (declining to apply legal standard not suggested by the plaintiffs and deeming the argument waived); *see also Starks*, 123 F. Supp. 3d at 1061; *Northbound Grp., Inc.*, 5 F. Supp. 3d at 973–74. For these reasons, we will not entertain PTRIL's argument concerning application of Banco's credits to the untimely claims.

### C.     Consideration of PTRIL's "Account Stated" Theory

In response to Banco's motion, PTRIL also argues that the July 31, 2008 bill, and Banco's failure to timely object thereto, created an "account stated." PTRIL asserts that the amended complaint includes a claim for account stated, apart from the contract claims, even if not delineated as a separate count. (Opp'n at 6–10; Sur-Reply at 2–10.)

#### 1.     Illinois Law Governing a Claim for Account Stated

In Illinois, an "'account stated' determines the amount of a preexisting debt when parties who previously have conducted monetary transactions agree that there truly is an account representing the transactions between them." *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009) (internal citation omitted); *Toth v. Mansell*, 207 Ill. App. 3d 665, 671–72, 566 N.E.2d 730, 734–35 (1st Dist. 1990); *Allied Wire Prods., Inc. v. Mktg. Techniques, Inc.*, 99 Ill. App. 3d 29, 39–40, 424 N.E.2d 1288, 1296–97 (1st Dist. 1981); *see also Citibank, N.A. v. Lelis*, 14 C 784, 2014 Ill. App. 140784, at *11 (1st Dist. Nov. 6, 2014). As the Seventh Circuit has described:

> When a statement of account is rendered by one party to another and is retained by the latter beyond a reasonable time without objection, that statement constitutes an acknowledgement and recognition by the latter of the correctness of

the account, together with a promise, express or implied, for the payment of such balance, and establishes an account stated.

*Delta Consulting Grp., Inc.*, 554 F.3d at 1137–38; *Toth*, 207 Ill. App. 3d at 671, 566 N.E.2d at 734; *Allied Wire Prods., Inc.*, 99 Ill. App. 3d at 40, 424 N.E.2d at 1296; *see ITQ Lata, LLC v. MB Fin. Bank, N.A.*, 317 F. Supp. 2d 844, 858–59 (N.D. Ill. 2004).  Under these specific circumstances, "the debtor and creditor have a meeting of the minds as to the accuracy of the account and have manifested their mutual assent to the agreement."  *Delta Consulting Grp., Inc.*, 554 F.3d at 1138; *Toth*, 207 Ill. App. 3d at 672, 566 N.E.2d at 735; *Allied Wire Prods., Inc.*, 99 Ill. App. 3d at 40, 424 N.E.2d at 1296.  As for the debtor who receives an account statement, "[t]he manner of acquiescence is not critical, and the meeting of the minds may be inferred from the parties' conduct and the circumstances of the case."  *Delta Consulting Grp., Inc.*, 554 F.3d at 1138 (quoting *Toth*, 207 Ill. App. 3d at 672, 566 N.E.2d at 735); *ITQ Lata, LLC*, 317 F. Supp. 2d at 858 ("What constitutes a reasonable amount of time within which to make an objection depends upon the circumstances of the case, the ordinary course of business, and the relationship of the parties."); *Allied Wire Prods., Inc.*, 99 Ill. App. 3d at 40, 424 N.E.2d at 1296; *see also Motive Parts Co. of Am., Inc. v. Robinson*, 53 Ill. App. 3d 935, 938–39, 369 N.E.2d 119, 122 (1st Dist. 1977).

Consistent with these authorities, PTRIL now alleges that Banco's failure to object to the July 31, 2008 bill rendered an account stated between the parties, which brought the pre-1993 claims within the statute of limitations.  Banco challenges PTRIL's account stated claim in three ways.  Banco argues that: (1) PTRIL did not plead an account stated claim; (2) any such claim based on the pre-1993 billings is still untimely; and (3) PTRIL does not have enough evidence to raise a question of fact about the purported claim.  (Reply at 5–9.)  We address only the first argument, which we find dispositive.

## 2. Whether PTRIL Alleged an Account Stated Claim

PTRIL articulated a claim for account stated in response to the pending motion. (Opp'n at 6–10.) As Banco points out, PTRIL did not include a separate count for account stated in the amended complaint. (Reply at 5–6.) Indeed, the only remaining claim set forth specifically in the amended complaint is the now-dismissed breach of contract action. (Am. Compl. ¶¶ 30–31.)

In its sur-reply, PTRIL contends that it has asserted an account stated theory since it filed the lawsuit. (Sur-Reply at 3.) PTRIL argues that it alleged sufficient facts in its amended complaint to support this claim. (*Id.*)

The Seventh Circuit has emphasized that "it is factual allegations, not legal theories, that must be pleaded in a complaint." *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014); *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 743–44 (7th Cir. 2015) (holding that plaintiff was "entitled to refine its rescission theory at summary judgment"); *see Aranda v. Caribbean Cruise Line, Inc.*, 12 C 4069, 2016 WL 1555576, at *10 (N.D. Ill. Apr. 18, 2016); *Torres v. City of Chi.*, 194 F. Supp. 2d 790, 793 (N.D. Ill. 2002). As a result, at the summary judgment stage, courts typically will allow a plaintiff to pursue an alternative legal theory, based on existing allegations, but will reject a plaintiff's attempt to introduce new facts. *Whitaker*, 772 F.3d at 808; *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 813–14 (7th Cir. 2011) ("It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion."); *Messner v. Calderone*, 407 F. App'x 972, 974 (7th Cir. 2011) ("A plaintiff cannot add additional claims through arguments made in opposing summary judgment."); *see CMFG Life Ins.*, 799 F.3d at 743–44 ("The due-diligence representations are not a new claim; they are simply another factual basis for rescission."); *Aranda*, 2016 WL 1555576, at *10 ("The bottom line is that defendants have been on notice since near the outset of the case that plaintiffs

seek to hold them vicariously or jointly liable, and that is all plaintiffs were required to do."); *Torres*, 194 F. Supp. 2d at 793 ("Although a plaintiff may not amend her complaint through arguments in her brief in opposition to a motion for summary judgment . . . the plaintiff has done no more than offer an alternative legal theory."). The question before us is whether PTRIL's account stated claim is an impermissible "new factual theory of liability" or is merely an "alternative legal characterization." *Whitaker*, 772 F.3d at 808–09.

To answer this question, we compare the complaint with the allegations necessary for the purported account stated claim. PTRIL points to paragraphs thirteen and eighteen to support the claim. (Sur-Reply at 3.) Paragraph thirteen states that "[e]ach treaty anticipated that the amounts owed by and to each party would arise from multiple transactions involving both credits to and debits against each party from various sources, extending over lengthy and indeterminate periods of time." (Am. Compl. ¶ 13.) PTRIL thus alleges that the parties' "conducted monetary transactions" over time, as necessary for an account stated claim. *Delta Consulting Grp., Inc.*, 554 F.3d at 1137; *Toth*, 207 Ill. App. 3d at 671–72, 566 N.E.2d at 734–35. Paragraph eighteen further alleges that once the liquidator "was satisfied that all or substantially all of the events which could affect the amount due to or from [Banco] had been accounted for, the [l]iquidator provided a final account stated with respect to each treaty of reinsurance, and demanded payment of the net amount due to Pine Top." (Am. Compl. ¶ 18.) Based on this language, PTRIL plainly alleges that the liquidator issued a final statement of account to Banco—the July 31, 2008 bill— "representing the transactions between them." *Delta Consulting Grp., Inc.*, 554 F.3d at 1137–38; *Toth*, 207 Ill. App. 3d at 671–72, 566 N.E.2d at 734–35.

Nonetheless, PTRIL's amended complaint is missing an essential element for an account stated claim. There are no allegations claiming, or permitting the inference, that Banco assented

to the July 31, 2008 final billing. To the contrary, PTRIL repeatedly alleges that Banco "failed and refused to pay the amounts that it owed to Pine Top." (Am. Compl. ¶ 19; *see also id.* ¶ 23 (alleging that Banco "did not pay" and "failed and refused to do so"); *id.* ¶ 24 (alleging that PTRIL demanded arbitration "because of [Banco's] refusal" to pay); *id.* ¶ 25 ("A controversy has therefore arisen . . . out of [Banco's] refusal to pay the amounts due."). Moreover, the existing factual allegations that Banco refused to pay the amounts due are inconsistent with the new factual allegation that Banco acquiesced to the July 31, 2008 billing by failing to object within a reasonable amount of time. (A refusal to act is essentially the opposite of tacitly agreeing to act.) As such, the amended complaint lacks any factual allegation supporting the theory that the parties had "a meeting of the minds as to the accuracy of the account" and "manifested their mutual assent." *Delta Consulting Grp., Inc.*, 554 F.3d at 1138; *Toth*, 207 Ill. App. 3d at 672, 566 N.E.2d at 735; *see also Citibank, N.A.*, 2014 Ill. App. 140784, at *11 (stating that the third element of the claim is an allegation that "the party owing the money *did not dispute the correctness of the bills* but also did not pay" (emphasis added)).

Because the amended complaint omits facts about mutual assent necessary to support an account stated claim, PTRIL's attempt to assert that claim at this juncture is inappropriate. This claim represents a "new factual theory of liability" and not simply an "alternative legal characterization" based on facts previously alleged. *Whitaker*, 772 F.3d at 808–09. PTRIL may not rely on this claim in its attempt to forestall summary judgment, and we will not consider it.[18]

---

[18] Even if we considered the account stated claim, it is not clear that it would survive summary judgment. Banco disputes that it received the July 31, 2008 bill shortly after it was mailed. The date of receipt is relevant as to whether Banco unreasonably delayed objecting to the bill, thus assenting to its contents. As evidenced by the parties' briefing, it appears that this claim might boil down to PTRIL's reliance on the Illinois "mailbox rule" to establish a presumption that Banco received the July 31, 2008 billing in due course. (Sur-Reply at 8–10; Opp'n to Sur-Reply at 4–5.) While we need not resolve the matter, we are not convinced that the mailbox rule could

**CONCLUSION**

For the reasons discussed above, we hereby grant Banco's motion for summary judgment. PTRIL's breach of contract claim is untimely, and PTRIL has not sufficiently articulated or supported any additional claims or theories that preclude judgment in favor of Banco. This case is terminated. It is so ordered.


Marvin E. Aspen
United States District Judge


Dated: May 31, 2016
　　　Chicago, Illinois

---

apply in this unusual case. As PTRIL explained in its sur-reply, the mailbox rule rests on the probability that postal employees will do their duty. (Sur-Reply at 9 (citing *Rosenthal v. Walker*, 111 U.S. 185, 193–94, 4 S. Ct. 382, 386–87 (1884)).) *See Henderson v. Carbondale Coal & Coke Co.*, 140 U.S. 25, 37, 11 S. Ct. 691, 695 (1891) ("This presumption . . . is based on the proposition that the post-office is a public agency charged with the duty of transmitting letters."); *Ashley Wire Co. v. Ill. Steel. Co.*, 164 Ill. 149, 158–59, 45 N.E. 410, 413 (Ill. 1896) ("The presumption that the letter was received is founded upon the regularity and certainty with which the mail is carried and delivered."). Because the presumption rests on the regularity and dependability of the United States Postal Service, we question whether the presumption can be extended to mailings that are transferred and delivered internationally. *See, e.g.*, *In re Auction House Antitrust Litig.*, 00 C 648, 2004 WL 3670993, at *7 (S.D.N.Y. Nov. 17, 2004) ("Mailings to foreign countries stand on a somewhat different footing, and are subject to multiple unknown factors."). (*See, e.g.*, Def.'s Ex. 37 (8/16/95 fax from Chiltington (a collection agent) to Office of the Special Deputy, stating that: "Having dealt with Banco before, I know that there are many problems with the Postal Service in Uruguay, and that we only succeed in sending documentation to them by courier, fax or personal visit."). Of course, our skepticism is based on the assumption that the liquidator in fact *mailed* the July 31, 2008 bill, rather than sending it through some other means (i.e., FedEx). Relatedly, there is no evidence in the record as to what method the liquidator used to send the bill or whether the postage was proper, omissions that could also defeat PTRIL's invocation of the mailbox rule.